**2025 UT App 146**

## THE UTAH COURT OF APPEALS

AMBER MONTGOMERY,
Appellant and Cross-appellee,
*v.*
JEFFREY P. GARDINER AND UTAH VALLEY EYE CENTER, INC.,
Appellees and Cross-appellants.

Opinion
No. 20230415-CA
Filed October 9, 2025

Fourth District Court, Provo Department
The Honorable Robert A. Lund
No. 190400226

Justin D. Heideman and Justin R. Elswick,
Attorneys for Appellant

Kirk G. Gibbs and Devin H. Geier,
Attorneys for Appellees

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES RYAN M. HARRIS and AMY J. OLIVER concurred.

LUTHY, Judge:

¶1      Dr. Jeffrey P. Gardiner, an ophthalmologist employed by Utah Valley Eye Center, Inc., performed cataract surgery on Amber Montgomery's left eye. After the surgery, Montgomery experienced poor eyesight and other increasingly troubling vision problems in that eye. She repeatedly reported these to Gardiner during her post-operative visits, and he repeatedly informed her that he saw nothing concerning. Nearly three months after the surgery, an on-call ophthalmologist diagnosed Montgomery with multiple retinal tears and retinal detachment, and Montgomery had corrective surgery the next day. Montgomery has not regained vision in her left eye. After learning of Montgomery's retinal detachment, Gardiner reviewed a scan he took at one of

Montgomery's post-operative appointments and determined that a retinal detachment was visible in that scan.

¶2     Montgomery sued Gardiner and Utah Valley Eye Center (collectively, UVEC), alleging that Gardiner's delay in diagnosing her retinal detachment caused her vision loss. UVEC filed a motion in limine seeking to prevent Montgomery's expert witness, an ophthalmologist, from testifying about the cause of Montgomery's vision loss, asserting that the expert was unqualified to do so because he was not a retina specialist. The court denied the motion and permitted the expert to testify at trial. After Montgomery presented her case-in-chief, UVEC moved for judgment as a matter of law, arguing that Montgomery had provided no evidence of causation. The court agreed and granted the motion.

¶3     Montgomery appeals, contending that the district court erred in granting UVEC's motion for judgment as a matter of law. UVEC cross-appeals, arguing that the court erred in denying its motion in limine and permitting the expert to testify on causation. We conclude that the expert was qualified to testify as to causation and that Montgomery did put on evidence of causation from which a jury could find in her favor. Therefore, we reverse the district court's judgment as a matter of law and remand this matter for retrial or other appropriate proceedings consistent with this opinion.

BACKGROUND

*Montgomery's Ocular History*

¶4     When Montgomery was five years old, she was diagnosed with type 1 diabetes. She later developed diabetic retinopathy,[1]

---

1. "Diabetic retinopathy is a complication of diabetes that affects the eyes. It is caused by damage to the blood vessels in the light-

(continued…)

and she had laser treatments in both eyes to address this condition. She also had successful cataract surgery on her right eye in 2009.

¶5     In August 2017, Montgomery saw Gardiner for a consultation regarding cataract surgery for her left eye. During that visit, he recorded her distance vision in her left eye as 20/30. Gardiner performed cataract surgery on Montgomery's left eye on September 18, 2017.

¶6     After the surgery, Montgomery noticed that her eyesight had not come back right away, as it had following her right-eye cataract surgery, and that her eye was "uncomfortable," her vision was "blurry," and it "[f]elt like maybe something was in [her] eye." The day after the surgery, she met with Gardiner for a postoperative appointment. He told her that it was normal for her vision to be a little blurry and that it could take up to three weeks to clear up. He recorded her distance vision as 20/50-3, meaning she could read the 20/50 line but missed three letters on that line. She had another postoperative appointment with Gardiner ten days after the cataract surgery. At that appointment, her vision was measured at 20/50-2. She expressed to Gardiner that she still had blurry vision and was experiencing discomfort, flashes of light, and floaters, which symptoms were causing headaches. Gardiner told her that she had dry eyes and that she needed to drink more water. He also recommended contact lenses and eye drops to correct the blurry vision.

¶7     Two weeks later, on October 12, Montgomery went in for another follow-up appointment and reported that she was still experiencing "[b]lurred vision," that she "[c]ouldn't focus," that she saw "flashing lights," and that "black spots were becoming

---

sensitive tissue at the back of the eye . . . ." *Diabetic retinopathy*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/ diabetic-retinopathy/symptoms-causes/syc-20371611 [https://per ma.cc/X7ES-E7U6].

more frequent." Gardiner told Montgomery that "everything looked normal," and he recorded her vision as 20/50. A scan of her eye was also taken to look closer at the retina[2] and the inner part of her eye. When Gardiner reviewed the scan that day, he did not notice any retinal detachment. He again recommended an increase in Montgomery's water intake, and he ordered her new contact lenses. He also said she may want to see a retina specialist if the problems she described were still bothering her in a few weeks.

¶8 Two weeks later, Montgomery had her last follow-up appointment with Gardiner, and her vision was recorded as 20/30+. Montgomery reported that she felt like something was in her left eye and that her contact would fog over after she wore it for ten to fifteen minutes. Gardiner told her that her symptoms were normal and that he did not see anything wrong with her eye. He, again, ordered her a new contact lens to try.

¶9 By December 7, Montgomery started to lose all functional use of her left eye. The next day, she developed a bad headache, was nauseous, and had black spots in her vision. The day after that, she noticed that "the black on the side of [her] vision was getting worse, moving towards [her] center of vision," and that the black spot at the bottom of her vision was moving up. When she awoke on December 10, "it was blatantly obvious that it was worse": the black area was "all the way over," and she "could not see out [of her] left eye." She called the on-call doctor (Doctor) for Utah Valley Eye Center and told him what she was experiencing. She went in for an exam that day, and Doctor told her she had a detached retina. Specifically, he said there was a "retinal detachment with multiple breaks." He recorded her vision as 20/30 and told her she needed surgery right away. The next

---

2. "The retina is the light-sensitive layer of tissue at the back of the eyeball. Images that come through the eye's lens are focused on the retina." *Retina*, MedlinePlus, https://medlineplus.gov/ency/article/002291.htm [https://perma.cc/KMX4-SDVR].

morning, the on-call retina specialist (Surgeon) performed surgery to reattach Montgomery's retina. Because the retina was almost "completely detached and folded" or "wrinkled," "the surgery took longer than [anticipated]."

¶10 At her post-operative appointment with Surgeon a few days after the surgery, Montgomery had "no vision" out of her left eye—"[i]t was just black." Since then, her eyesight has never returned to what it was before her cataract surgery, and she "can't see much out of [her] left eye." Because of this, Montgomery sued UVEC in February 2019, alleging medical malpractice and respondeat superior. Montgomery claimed that UVEC breached its duty to provide her with care and treatment "within the professional standard of care" by "failing to properly examine, evaluate, workup, refer, treat, . . . obtain specialist consultations [for], and/or properly diagnose [her]" and that because of this breach, she "suffered from an undiagnosed retinal detachment, which led to permanent blindness in her left eye."

¶11 After Gardiner learned of Montgomery's claims, he reassessed the scan from her appointment with him on October 12 and, after changing some of the scan settings, saw that a peripheral retinal detachment had been visible at the time of that appointment.

*UVEC's Motion in Limine and the Rule 702 Hearing*

¶12 Before trial, UVEC filed a "motion in limine to exclude causation testimony from [Montgomery's] expert" (Expert). UVEC argued that Expert was unqualified to opine about causation because, although he was a board-certified ophthalmologist, he did "not treat diabetic retinopathy" and did not "perform surgery to repair detached retinas." After receiving written arguments from both sides, the district court conducted a rule 702 hearing at the beginning of trial, outside the presence of the jury. *See generally* Utah R. Evid. 702 advisory committee's original note (stating that trial judges have "a 'gatekeeper' responsibility to screen out unreliable expert testimony" and that

"it is not contemplated that evidentiary hearings will be routinely required in order for the trial judge to fulfill [that gatekeeper] role," but implying that such hearings may be employed).

¶13 During that hearing, Expert reviewed his background and training, indicating that he graduated from medical school, completed an internship in internal medicine, and fulfilled a three-year residency in ophthalmology. He did not go on to become a retina specialist (which is accomplished by completing a two-year fellowship after residency) but instead became a board-certified ophthalmologist. He served four years in the United States Air Force as an ophthalmologist before entering private practice as a general ophthalmologist. He had performed various types of surgeries throughout his career, though he had never repaired a detached retina. He had also performed laser treatments for proliferative diabetic retinopathy.[3]

¶14 Expert indicated that over his forty years of practice, he had diagnosed many patients with retinal tears and detachments. Typically, he explained, general ophthalmologists detect and diagnose retinal tears and detachments and then refer the patients with those conditions to retina specialists for surgery. After surgery, he said, those patients are usually seen by retina specialists for immediate follow up, and then they return to general ophthalmologists for continued care.

¶15 Expert testified that he read medical literature related to retinal detachments throughout his career and had continued to

---

3. "Proliferative retinopathy is the advanced stage [of diabetic retinopathy,] where abnormal new blood vessels grow on the surface of the retina. These vessels may break and bleed into the vitreous, the clear watery gel that fills the eye, and cause severe vision loss." Mira Sachdeva, *Diabetic Retinopathy*, Johns Hopkins Med., https://www.hopkinsmedicine.org/health/conditions-and-diseases/diabetes/diabetic-retinopathy [https://perma.cc/6A7G-VZND].

do so since retiring from providing clinical care. He discussed three specific studies related to retinal detachments—one recommending surgery within three days for some detachments, one comparing outcomes of detachment repair surgeries performed within twenty-four hours to those of surgeries performed later, and one indicating that certain patients should be carefully screened for missed retinal breaks.

¶16    After the examination of Expert, the court stated,

> I find that . . . this is an extremely complicated field that requires expert testimony. [Expert] is an over 40-year practicing ophthalmologist. He's conducted surgery. He's reviewed the literature. It would certainly be helpful to the jury to hear testimony and his opinions in that regard, so I'm going to . . . allow it.

The court then confirmed with Expert that he would opine (1) "that failure to diagnose the retinal tear earlier was a breach of the standard of care" and (2) "that, based on [Expert's] experience with patients who had . . . similar situation[s], and [Expert's] review of the literature, . . . those delays correspond to loss of vision."

*The Trial*

¶17 After the rule 702 hearing, the trial proceeded. Montgomery called Gardiner as her first witness. He admitted that the October 12 imaging showed a peripheral retinal detachment. He explained that he did not identify the detachment at the time the scan was taken because he was focused on the central retina. He said he was "not disputing the fact that [he] missed the retinal detachment." And he stated that "the sooner [a doctor] can refer a patient to a retina specialist, the better, because a peripheral detachment can progress to a central detachment" and "that's the urgency for referral to a retina[] specialist."

However, Gardiner indicated that Montgomery's "peripheral detachment did not progress to a central detachment" and "her vision was still 20/30 when [Doctor] saw her two months later." Gardiner then opined that "whether or not she had the retinal detachment repair . . . in October or in December, she most likely would've suffered a similar outcome." Nonetheless, he agreed that "if the retinal detachment had been treated" in October, he "would not [have] expect[ed] it to significantly affect her vision going forward."

¶18 Montgomery next called Expert to testify. He began by explaining his background, education, and training, as recounted above. Using a diagram, he then identified various parts of the eye, including the retina. Expert was asked to explain the function of the retina, which he did, saying, "The retina is the actual seeing tissue of the eyes. So when light comes into the eye and hits the retina, the retinal cells are stimulated and, in turn, messages are sent to the brain through the optic nerve." Expert identified "a place within the retina" called the macula. The macula, he said, is "the center of the retina," and it provides "color vision and sharp visual acuity." Expert also explained that the area in the rear of the eye—between the lens and the retina—is called the vitreous space and that it is filled with vitreous fluid, "an inactive gel-like substance that sort of [functions as] the internal skeleton of the eye" and "drains toxins and other metabolic products from the retina and other inner parts of the back of the eye."

¶19 Expert testified that when there is "a break or a tear in the retina," "the tear allows fluid that's in the vitreous to go through the tear . . . into the subretinal space." He said that this "percolat[ing]" of fluid into the subretinal space "elevates the retina." As fluid continues to pass through the tear, Expert explained, "it spreads underneath the retina, . . . and the more it spreads, the more likelihood there is of it getting to the macular tissue." The risk "when the retina is [so] elevated," Expert declared, is that "it can lead to a full detachment [of the retina], which can affect the macula." Expert testified that when the

macula becomes detached (a mac-off detachment), "the potential for [restoring] good vision [through] surgical repair is much lower than it [is] if the macula [is] still on" (a mac-on detachment). Specifically, Expert stated that if the macula is detached, a patient after surgery likely will not "be able to even see the big E on the eye chart," but if the macula is on, there is "an opportunity to still get vision in the . . . 20/50 to 20/80 range." For that reason, Expert explained, when a retinal detachment is discovered, the standard of care is to refer the patient to a retina specialist "within the first day or so after the diagnosis." Such a reference is usually made "urgently," especially if the macula is still attached "because that would indicate there's still a possibility of getting a good visual result after the surgery."

¶20 Expert was asked to review Montgomery's imaging from October 12. He pointed out markers that "[i]n most cases . . . would indicate a retinal detachment." He stated that the scan showed "the retina ha[d] been elevated from its usual location, probably by fluid" and that the source of the fluid was "most probably . . . a break or a tear in the retina." He reaffirmed that "an urgent diagnosis and treatment referral is the standard of care associated with the ophthalmological practice of diagnosing retinal tears and treating them." And he opined that Gardiner had breached that standard of care.

¶21 Expert also reviewed Doctor's report from examining Montgomery on December 10, 2017. In that report, Doctor indicated that Montgomery had "retinal detachment with multiple breaks," which Expert clarified meant "there were tears in the retina in several different locations." Expert explained that only one tear was visible on the imaging done on October 12 because that image did not show the peripheral retina. Expert also discussed Surgeon's operative report.[4] In that report, Surgeon noted that Montgomery had proliferative retinopathy but that she had "undergone successful treatment of proliferative disease and

---

4. Surgeon passed away before the trial in this case.

relaxation of hemorrhage with clearance" and that she also had undergone "a vitrectomy in the left eye a few years [previously]."[5] Surgeon made the following statement regarding Montgomery's condition following her left-eye cataract surgery: "[E]ver since the surgery, she complained of darkening of the peripheral vision, which has become progressively worse until yesterday, when she . . . presented a detachment of the entire retina, except for the central macula, miraculously." When asked if this was a "partial detachment situation," Expert responded, "Well, he's describing it as the fact that the macula's attached, so it's partial in the sense that the periphery was detached, but not the center." Expert stated that peripheral detachment would cause darkening of the peripheral vision.

¶22　In response to questioning by Montgomery's attorney, Expert then testified as follows:

> Q.　Have you ever encountered a patient in your 40-year history who had a late diagnosis of a retinal tear that, following surgery, came away with what we would call a vision acuity above 20/50?
>
> A.　No.
>
> Q.　Conversely, have you ever had a postoperative care patient who had a retinal tear that was diagnosed and had surgery to correct the tear within 10 days, that came out

---

5. "Vitrectomy is a surgical procedure undertaken by a specialist where the vitreous humor gel that fills the eye cavity is removed to provide better access to the retina." *Vitrectomy*, The Found. of the Am. Society of Retina Specialists, https://www.asrs.org/patients/retinal-diseases/25/vitrectomy [https://perma.cc/T67W-EBPW].

of that surgery with ocular vision at worse than 20/50?

A.    Generally not.

Q.    Can you say with . . . a reasonable degree of certainty, in your professional medical opinion, that the delay in [Montgomery's] surgery is what resulted in the injury that [Montgomery] suffered?

A.    I would.

Thereafter, Expert opined again that "Gardiner's failure to diagnose and ultimately refer [Montgomery] for treatment result[ed] in the injury [Montgomery] suffered."

¶23    On cross-examination, Expert first acknowledged that Montgomery "lost her central vision" and that "the macula is responsible for the central vision." He also acknowledged that when Montgomery's retinal detachment was finally diagnosed on December 10, 2017, her macula was still attached, "her visual acuity . . . was 20/30-plus," and her interocular pressure was "normal." Expert agreed that "one of the . . . primary factors of [Montgomery's] vision loss [was] hypotony"—which he later described as when "the pressure in the eye, the intraocular pressure, is low"—and he acknowledged that "the hypotony occurred subsequent to the surgical repair of the detached retina." He also stated that Montgomery's "history of proliferative diabetic retinopathy" was "one of many" causes of her vision loss and that the "weakness in [her] retina" from the "many breaks . . . that had to be treated" was another cause.

¶24    Ultimately, Expert agreed with UVEC's counsel's characterization of his opinion as being "that the failure to diagnose and refer the patient after the detached retina occurred was the cause of [Montgomery's] vision loss." Expert then said he

had been "very surprised" to learn that Montgomery's recorded vision was 20/30 at her December 10 exam, and he stated that he thought that measurement of her visual acuity and the measurement of her interocular pressure that day may have been incorrect. But he said that even if those measurements were accurate, his causation opinion would not change.

¶25    On redirect, Expert clarified that although he had been asked on cross-examination "a whole bunch of questions about the central macula," "it wasn't just [Montgomery's] central macula that was affected"—"[i]n fact, it was the peripheral macula." He explained that when "the retina gets detached and deprived of its circulation, the worse the peripheral vision" becomes and, therefore, that "if you have a patient who's experiencing darkening of their peripheral area," "the main culprit[] would be retinal detachment." Thus, Expert declared, the darkening of Montgomery's peripheral vision was a result "of a retinal detachment." "[I]n fact," Expert noted, "[Surgeon said] that it was a miracle that the central vision was still attached."

¶26    Expert was also asked about low pressure in the eye. He explained that when the pressure is low, that "means that the fluid production is abnormally low" and something in the ciliary body, which makes aqueous humor, "is not working well."[6] Expert and Montgomery's counsel then engaged in the following exchange:

---

6. At the front of the eye, there is "an anterior chamber, which is the area between [the] lens and cornea," and "a posterior chamber, which is the area between [the] lens and iris." *Aqueous Humor & Vitreous Humor*, Cleveland Clinic, https://my.clevelandclinic.org/health/body/24611-aqueous-humor-vitreous-humor [https://perma.cc/PF45-XGY6]. "In the posterior chamber, the ciliary body makes aqueous humor." *Id.* "The aqueous humor keeps [the] eye inflated and provides nourishment." *Id.* The vitreous humor, on the other hand, "makes

(continued…)

Q.     Okay. But if there's low pressure and there's low vitreous fluid, what happens to the eye?

A.     The eye will deflate like a beach ball.

Q.     And if the eye deflates, then that allows what to happen?

A.     . . . [T]he retina is turned into a number of folds, almost like an umbrella in its folded state, and, of course, the eye can't tolerate that, and the vision that's produced by that retina is very poor.

Q.     Vision would be occluded by the folds?

A.     . . . [N]ot so much occluded by the folds, but the retina being thrown into folds makes it hard to get a single image.

Q.     So if you have . . . a hole in your bucket and the water's coming out and you don't have a rigid, firm, plastic outside, which . . . an eyeball doesn't have, what happens?

A.     Well, . . . the eyeball deflates. It can't hold . . . its normal functioning state. It has to be perfectly spherical in order for the optics of the eye to focus light on the retina.

Q.     And that's because, when light comes through the pupil towards the [macula], . . .

---

up the vitreous body located in the vitreous cavity [at the back of the eye,] between [the] lens and retina." *Id.*

those light beams are directed at a straight angle; is that correct?

A.    Correct. That's correct.

Q.    Okay. And so if you have the eye with low pressure, low vitreous fluid, it's deflating, then that light's not going to come in straight.

A.    Correct.

Q.    That causes bad vision.

A.    Correct.

Q.    And, in fact, if you have this tear and the fluid is coming into this vitreous area, is that increasing the rapidity with which these folds will form?

A.    Eventually, yes.

Q.    And does that have an impact on the peripheral vision?

A.    It does.

Q.    . . . The question that I'm asking you is, did the failure to find this tear and fix it urgently result in the harm that my client suffered?

A.    Yeah. I think that that question encompasses it completely.

Q.    And do you agree with Dr. Gardiner's testimony that, if this had been found rapidly, the vision could've been absolutely saved?

> A. I believe that it would've been much better, yes.

¶27 On recross-examination, Expert and UVEC's counsel then had the following exchange:

> Q. [You are not testifying] that . . . leaks behind the retina and . . . the retinal detachment[] [were the] cause of [Montgomery's] hypotony, are you?
>
> A. No, . . . I'm really not saying that, because I think that the failure of the ciliary body to keep up its production is totally related, because the ciliary body is part of the iris-choroid-ciliary body continuum.[7]
>
> Q. Okay.
>
> A. So anything that will affect the far reaches of the eye, such as subretinal fluid expansion, is going to have an impact on the ciliary body's production . . . of aqueous [humor], leading to hypotony.
>
> Q. And that's exactly what occurred here, correct?

---

7. The iris, choroid, and ciliary body together make up the uvea, "a three-part structure that surrounds most of [the] eye." *Uvea*, Cleveland Clinic, https://my.clevelandclinic.org/health/body/uvea [https://perma.cc/43ED-6NNU]. The choroid in particular "is a thin sheet of tissue packed with blood vessels" that "wrap[s] around the central and rear-most sections of [the] eyeball" and "supplies blood to various parts of [the] eye (especially [the] retina[])." *Id.*

> A. Yeah, . . . I'm saying that there was a relationship, but that was not the primary thing going on. . . . [N]othing is black and white in ophthalmology. There can be concurrent pathological processes that go on.

*Motion for Judgment as a Matter of Law*

¶28 At the close of Montgomery's case-in-chief, UVEC moved for judgment as a matter of law under rule 50 of the Utah Rules of Civil Procedure, arguing "that a reasonable jury would not have [a] legally sufficient evidentiary basis to find [for Montgomery] on the element of causation." After hearing oral arguments from both sides, the court granted the motion, reasoning as follows:

> I've taken some time to reconsider the testimony in this case, and based on my review of the testimony, I believe [Montgomery] has failed to provide sufficient expert testimony to meet the necessary standard here.
>
> I assumed that [Montgomery] would call a retina[] specialist to provide the type of testimony we need here. . . .
>
> [Expert's] testimony . . . lacks specificity. He didn't give a specific explanation as to how or why the delay caused the loss of vision here. That's . . . too slight. I erred on the side of allowing the jury to hear that testimony, thinking that he would get there. In the end, he simply didn't.
>
> And based on that, it gives me no pleasure to . . . have to grant . . . the [r]ule 50 motion.

The court then entered judgment against Montgomery, dismissing her claims with prejudice.

*The Appeal and Cross-appeal*

¶29　Montgomery timely appealed the grant of UVEC's motion for judgment as a matter of law. And UVEC filed a cross-appeal, arguing that the court improperly denied UVEC's motion in limine to exclude Expert's causation testimony.

ISSUES AND STANDARDS OF REVIEW

¶30　Montgomery asserts in her appeal that the district court erred in granting UVEC's motion for a judgment as a matter of law. "We review a [district] court's grant of [judgment as a matter of law] for correctness, and will sustain a [judgment as a matter of law] if, after examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor." *Gilbert Dev. Corp. v. Wardley Corp.*, 2010 UT App 361, ¶ 15, 246 P.3d 131 (cleaned up).

¶31　UVEC claims on cross-appeal that the district court abused its discretion when it denied UVEC's motion in limine to exclude causation testimony from Expert because he was unqualified. "We review a district court's decision to admit or exclude expert witness testimony for an abuse of discretion and will not reverse that decision unless it exceeds the limits of reasonability." *Taylor v. University of Utah*, 2019 UT App 14, ¶ 10, 438 P.3d 975 (cleaned up), *aff'd*, 2020 UT 21, 466 P.3d 124. "We also review decisions relating to the qualifications of a witness as an expert or as a lay witness for an abuse of discretion." *Hallett v. Tully*, 2024 UT App 90, ¶ 14, 552 P.3d 779 (cleaned up).

ANALYSIS

¶32　To reach the issue raised by Montogomery's appeal, we must first determine whether Expert was qualified. We therefore

first address UVEC's cross-appeal and then turn to Montogomery's appeal.

## I. UVEC's Cross-appeal on Expert's Qualifications

¶33 UVEC asserts that the district court erred by denying its motion in limine to exclude causation testimony from Expert. UVEC argues that "while [Expert] may have been qualified to opine on the standard of care applicable to [Gardiner] during his postoperative care of [Montgomery], he was not qualified to opine on the harm, if any, caused by the delayed repair of [Montgomery's] detached retina."

¶34 Under rule 702(a) of the Utah Rules of Evidence, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."

¶35 "It is true that, ordinarily, a practitioner of one school of medicine is not competent to testify as an expert in a malpractice action against a practitioner of another school." *Burton v. Youngblood*, 711 P.2d 245, 248 (Utah 1985). And UVEC points us to *Kent v. Pioneer Valley Hosp.*, 930 P.2d 904 (Utah Ct. App. 1997), in which we held that a nurse's "affidavit [did] not provide the requisite foundation to qualify her as an expert capable of testifying as to the proximate cause of [the] plaintiff's alleged nerve damage." *Id.* at 907. There, we reasoned that while "a nurse may well be trained in the proper location to administer injections, we [we]re not persuaded that a nurse is qualified to opine as to nerve damage caused by an allegedly improper injection." *Id.* We determined that knowledge related to that issue fell within the expertise of a neurologist. *See id.* UVEC now contends that *Kent* demonstrates that Expert was not qualified to testify on causation because retina specialists treat retinal problems and Expert is not a retina specialist. We are not persuaded.

¶36 This is not an instance where an expert medical witness attempted to testify regarding matters of expertise associated with a different school of medicine. Expert is an ophthalmologist. Ophthalmology is "a branch of medical science dealing with the structure, functions, and diseases of the eye." *Ophthalmology*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ophthalmology [https://perma.cc/U8VZ-2ZN5]. Thus, Expert was qualified to opine about "the structure, functions, and diseases of the eye," *id.*, including causes of vision loss. Moreover, "[a] retina specialist is an ophthalmologist who has undergone additional training to become an expert in the diagnosis, management and treatment of diseases and surgery of the vitreous body of the eye . . . and the retina." *What is the Difference Between an Ophthalmologist and a Retina Specialist?*, Associated Retina Consultants, https://associatedretinaconsultants.com/what-is-the-difference-between-an-ophthalmologist-and-a-retina-specialist/ [https://perma.cc/8LVH-CV6E]. In other words, ophthalmology is a medical specialty, and a retina specialist practices in a *sub*-specialty of ophthalmology, not a different specialty altogether. *See* Kierstan Boyd, *Ophthalmology Subspecialists*, Am. Academy of Ophthalmology (Feb. 24, 2023), https://aao.org/eye-health/tips-prevention/ophthalmology-subspecialists [https://perma.cc/D6S4-BC5W] (identifying a "retina specialist" as a "subspecialist" in ophthalmology). Accordingly, this case is unlike *Kent*. There, a registered nurse attempted to provide causation testimony within the specialty of neurology, but here, Expert opined as to causation within his own specialty.

¶37 The facts of this case fall closer to those in *Patey v. Lainhart*, 1999 UT 31, 977 P.2d 1193, than to those in *Kent*. In *Patey*, a party asserted that a particular expert could not "testify about endodontic treatments because he [was] not an endodontist" but instead "practice[d] general dentistry." *Id.* ¶ 17. *See generally Endodontics*, Merriam-Webster, https://www.merriam-webster.com/dictionary/endodontics [https://perma.cc/4PMN-AYNN] (defining endodontics as "a branch of dentistry concerned with

diseases of the pulp"). The dentist "testified that one-fourth of his dental education related to endodontics; that he was licensed by the state to perform endodontic procedures; that he had maintained an ongoing educational study of both general dentistry and endodontics by taking post-graduate courses, studying current professional publications, and attending 20 to 40 hours of professional seminars per year; and that endodontics constituted a substantial portion of his 36-year practice." *Patey*, 1999 UT 31, ¶ 18. Our supreme court determined that the dentist "was highly qualified, from both formal training and actual practice, to give expert opinions in general dentistry and endodontics." *Id.*

¶38 Similarly, Expert's formal training and actual practice qualified him to opine about causes of vision loss and consequences of delayed detection of retinal tears and detachments. Expert testified that he is a board-certified general ophthalmologist with over 40 years of practice, that during his practice he diagnosed many patients with retinal tears and detachments, that he provided postoperative care for patients with these conditions, that he performed various other types of ocular surgeries, that he performed laser treatments for proliferative diabetic retinopathy, and that he reviews and is up to date on current medical literature about retinal tears and detachments. Therefore, Expert was qualified.

¶39 UVEC further argues that Expert is unqualified because he refers patients to retina specialists when they need surgical repair or treatment for proliferative diabetic retinopathy and because he stated he would defer to a retina specialist "as to the appropriate surgical technique to repair a detached retina" and as to "the impact of [proliferative diabetic retinopathy] on [Montgomery's] current visual acuity." But our supreme court addressed a similar argument in *Patey* and found it unpersuasive:

> [The dentist's] consultation of other experts in the field of endodontics did not disqualify him from

testifying on the subject himself. Simply because an expert, qualified under [r]ule 702, admits that he or she consults other experts or admits that other specialists may be more qualified in some areas does not render that expert unqualified to testify in a matter. The rules of evidence establish a minimum baseline for expert qualifications. They do not mandate that litigants call only the most highly qualified experts to testify.

*Id.* ¶ 19 (cleaned up). Here, the fact that a retina specialist could opine as to the cause of Montgomery's vision loss—and may be even more qualified than Expert to do so—does not render Expert unqualified to opine on the subject. Expert satisfied the "minimum baseline" required by rule 702, *id.*, by demonstrating through his education and experience that he was qualified to opine on the subject at hand. And the fact that Expert did not himself perform retinal surgeries does not mean that he was unqualified to testify as to the consequences of delaying these surgeries; his education and experience provided him with such information. Therefore, the court did not abuse its discretion in deeming him qualified to provide causation testimony in this case.

## II. Montgomery's Direct Appeal

¶40   We next address Montgomery's appeal. Montgomery asserts that the district court erred when it granted UVEC's motion for judgment as a matter of law on the issue of causation.

¶41   Under rule 50 of the Utah Rules of Civil Procedure, judgment as a matter of law may be granted "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Utah R. Civ. P. 50(a)(1). "To establish medical malpractice, a plaintiff must prove," among

other things, "injury proximately caused by the [health care provider's] breach" of the applicable standard of care. *Morgan v. Intermountain Health Care, Inc.*, 2011 UT App 253, ¶ 8, 263 P.3d 405. "Proximate cause is generally determined by an examination of the facts, and questions of fact are to be decided by the jury." *Mahmood v. Ross*, 1999 UT 104, ¶ 22, 990 P.2d 933. "Thus, courts should refuse to grant a [judgment as a matter of law] on issues of causation if there is *any* evidence which might lead a reasonable jury to find a causal connection between a breach and a subsequent injury." *Id.* (emphasis added).

¶42 Here, Expert testified that Gardiner breached the applicable standard of care by not identifying Montgomery's retinal detachment that was visible in the October 12 scan and by failing to make an urgent referral to a retina specialist. He then provided repeated testimony of a causal connection between that breach and Montgomery's loss of vision. On direct examination, he testified as follows:

> Q.    Can you say . . . with a reasonable degree of certainty, in your professional medical opinion, that the delay in [Montgomery's] surgery is what resulted in the injury that [Montgomery] suffered?
>
> A.    I would.

He thereafter reaffirmed his opinion that "Gardiner's failure to diagnose and ultimately refer [Montgomery] for treatment result[ed] in the injury [Montgomery] suffered."

¶43 On cross-examination, Expert agreed with UVEC's counsel's characterization of his opinion as being "that the failure to diagnose and refer the patient after the detached retina occurred was the cause of [Montgomery's] vision loss." Then on redirect examination, while again under questioning by Montgomery's attorney, he testified as follows:

> Q. The question that I'm asking you is, did the failure to find this tear and fix it urgently result in the harm that my client suffered?
>
> A. Yeah. I think that that question encompasses it completely.

Plainly, Expert provided repeated testimonial evidence—on which a reasonable jury could rely—that Gardiner's breach of the applicable duty of care caused the injury to Montgomery.

¶44    UVEC acknowledges that Expert provided "conclusory opinion[s] that the delay [in diagnosis] caused [Montgomery's] vision loss." But it notes that a jury cannot be left to "speculate and guess on too many elements in the chain of causation." *Jackson v. Colston*, 209 P.2d 566, 569 (Utah 1949). *See generally Mahmood*, 1999 UT 104, ¶ 22 (explaining that a jury is not "free to find a causal connection between a breach and some subsequent injury by relying on unsupported speculation"). And it argues that the jury here needed to hear more from Expert than his conclusory opinion to base a finding of causation on more than mere speculation.

¶45    Specifically, UVEC asserts that "preventing a mac-on detachment from progressing to a mac-off detachment was the only specific reason [Expert] gave to explain why prompt referrals for surgical repair result in better visual outcomes" and that "[i]t was undisputed [that Montgomery's] detached retina had not progressed to a mac-off detachment before it was repaired." "In other words," UVEC argues, "the mere passage of time between detachment and repair does not establish a causal connection between 'delayed' repair and loss of vision."

¶46    Additionally, UVEC observes that Expert "agreed that hypotony and [proliferative diabetic retinopathy] were causes of" Montgomery's vision loss. And it asserts that "there was no testimony offered, expert or otherwise, to prove [Gardiner's]

failure to diagnose the retinal detachment caused or contributed to [the hypotony]" and that it "was also undisputed that [Montgomery's proliferative diabetic retinopathy] predated [Gardiner's] care." UVEC then argues that, "[h]aving acknowledged that [Montgomery's] vision loss was caused by hypotony that developed after the retinal repair and by her preexisting [proliferative diabetic retinopathy], neither of which were caused by [Gardiner], in order for the jury to find in favor of [Montgomery] on causation[,] [it] would have had to have heard more from [Expert] than his conclusory opinion that the delay caused [Montgomery's] vision loss."

¶47 UVEC's arguments suffer from two infirmities. First, when a qualified expert provides an admissible yet conclusory opinion on causation and a jury relies on that opinion to find that the defendant's breach caused the plaintiff's injuries, the jury's finding is not the product of speculation. An expert's opinion is admitted only if it "*will help the trier of fact* to understand the evidence or *to determine a fact in issue*." Utah R. Evid. 702(a) (emphasis added). Thus, if a causation opinion is admitted into evidence, the jury is not speculating if it bases its causation finding on that opinion.[8] Lack of a sufficient basis for the expert's opinion may make the opinion inadmissible under rule 702(b), and a less-than-stellar articulation of a proper basis for the opinion may be exposed through cross-examination and closing argument. But again, the jury's reliance on a properly admitted expert opinion does not amount to speculation.

¶48 Second, UVEC presents an incomplete picture of Expert's testimony. While Expert acknowledged that prompt diagnosis

---

8. We have concluded that the district court did not abuse its discretion in determining that Expert was qualified under rule 702(a) to offer a causation opinion, and UVEC did not argue below, and does not argue on appeal, that Expert's causation opinion was inadmissible under rule 702(b).

and referral to a retina specialist of retinal detachments was important in preventing mac-on detachments from becoming mac-off detachments and thereby achieving better outcomes, he did not testify that this was the only reason this timing mattered or the only reason a patient could suffer a worse visual outcome after a delay. Instead, he opined that the "weakness in [Montgomery's] retina" from the "many breaks . . . that had to be treated"—which weakness the jury might have inferred increased because of the delayed diagnosis and referral—was one cause of Montgomery's ultimate loss of vision. Then on redirect examination, Expert further clarified that although he had testified fairly extensively about the dangers of mac-off retinal detachment and that delayed treatment of peripheral detachment increased the risk of mac-off retinal detachment, "it wasn't just [Montgomery's] central macula that was affected"—"[i]n fact, it was the peripheral macula." He then explained that when "the retina gets detached and deprived of its circulation, the worse the peripheral vision" becomes and, therefore, that "if you have a patient who's experiencing darkening of their peripheral area," "the main culprit[] would be retinal detachment."

¶49   Additionally, Expert testified about the process of fluid leaking from a retinal tear in the lengthy exchange from his redirect testimony included above. *See supra* ¶ 26. This testimony established several important points, including that Montgomery's decrease in peripheral vision was caused by vitreous material leaking into the subretinal space, that vision loss associated with retinal detachment can progress "as more and more of the photoreceptor layer and the retina gets detached and deprived of its circulation," and that the leaking of fluid "[e]ventually" increases the rapidity with which the retina "is turned into a number of folds." In this context, Montgomery's counsel then asked, "[D]id the failure to find this tear and fix it urgently result in the harm that my client suffered?" Expert relied, "Yeah. I think that that question encompasses it completely." Finally, counsel asked whether Expert agreed "that, if this had been found rapidly, the vision could've been absolutely saved,"

and Expert said, "I believe that it would've been much better, yes."

¶50 Moreover, not only did Expert identify the "weakness in [Montgomery's] retina" from the "many breaks . . . that had to be treated" as a cause of her vision loss—in addition to hypotony and proliferative diabetic retinopathy—he also tied the late diagnosis of Montgomery's retinal detachment to the hypotony that developed after the corrective surgery. Specifically, he said that the retinal detachment could have been related to "the failure of the ciliary body to keep up its production" of aqueous humor and that the lack of adequate aqueous humor led to hypotony. He explained that the retinal detachment could have affected the ciliary body's production of aqueous fluid "because the ciliary body is part of the iris-choroid-ciliary body continuum" and "anything that . . . affect[s] the far reaches of the eye, such as subretinal fluid expansion, is going to have an impact on the ciliary body's production . . . of aqueous [humor]."

¶51 From the portions of Expert's testimony identified above, a reasonable jury could have found a causal connection between Gardiner's delay in diagnosing Montgomery's retinal detachment and Montgomery's subsequent vision loss.[9] The jury could have

---

9. UVEC contends that *Ruiz v. Killebrew*, 2020 UT 6, 459 P.3d 1005, applies here and requires a different result. In *Killebrew*, a baby suffered a hypoxic brain injury during delivery. *See id.* ¶ 4. The plaintiffs' experts testified that the medical team that assisted with the delivery breached the applicable standard of care and that the injury occurred "because [the baby] was not delivered until after 10:30 p.m." *Id.* ¶¶ 3–4, 13. But the experts "did not testify that if the defendants had not breached the standard of care, [the baby] would likely have been born by 10:30 p.m." *Id.* ¶ 28. In other words, the *Killebrew* plaintiffs needed to show both (1) that the delay of the delivery until after 10:30 p.m. caused the injury and (2) that the defendants' breach of duty caused a delay until 10:30

(continued…)

accepted Expert's explanation and found that the delay in diagnosing Montgomery's detachment led to leaking of excess vitreous fluid and that this contributed to Montgomery's vision loss—either of its own accord or by impacting the ciliary body's production of aqueous humor or both. The jury could also have believed that prolonged lack of retinal circulation impacted Montgomery's later vision. Ultimately, the jury could have been persuaded that the weakened state of the retina from having multiple tears was at least a partial cause of Montgomery's vision loss and that the retina would not have been as weak as it was if Montgomery had received surgery months earlier.

¶52 While UVEC argues that Montgomery's measurements for intraocular pressure and visual acuity prior to Surgeon reattaching the retina undermine Expert's explanation, it is up to the jury to determine whether the delay caused all, some, or none of Montgomery's vision loss. Expert—an ophthalmologist with 40 years of clinical experience—maintained his causation opinion even after learning about Montgomery's pre-surgical measurements. A jury could have been persuaded from this and Expert's explanations of progressive damage that Montgomery's measurements were not dispositive in ruling out delay as at least a partial cause of her vision loss. Thus, rather than granting judgment as a matter of law, the district court should have permitted UVEC to present its case—complete with competing expert opinions—and allowed the jury to perform its fact-finding role. *See Management Comm. of Graystone Pines Homeowners Ass'n v. Graystone Pines, Inc.*, 652 P.2d 896, 897–98 (Utah 1982) ("In [granting judgment as a matter of law], the court is not free to

---

p.m., and they failed on the second point. Here, however, neither side disputes that there is a link between Gardiner's failure to timely diagnose Montgomery's detached retina and her delay in receiving surgery to reattach the retina. And, as we have discussed, Expert's opinion provided evidence that the delay was at least a cause of Montgomery's injury. Therefore, *Killebrew* is distinguishable and does not apply.

weigh the evidence and thus invade the province of the jury, whose prerogative it is to judge the facts. [Judgment as a matter of law] is only appropriate when the court is able to conclude, as a matter of law, that reasonable minds would not differ on the facts to be determined from the evidence presented." (cleaned up)). In sum, granting UVEC's motion for judgment as a matter of law constituted error.

CONCLUSION

¶53 Expert was qualified to opine on causation, so UVEC's cross-appeal fails. And Montgomery's appeal is well taken—the district court erred in granting judgment as a matter of law for UVEC because Expert's testimony provided evidence that could support a finding that Gardiner's breach of duty caused injury to Montgomery. We therefore reverse the court's order granting UVEC's rule 50 motion and its subsequent judgment dismissing Montgomery's claims. We remand this case for a new trial or other appropriate proceedings consistent with this opinion.

_____