2026 UT App 13

# THE UTAH COURT OF APPEALS

RICHARD TIDWELL,
Appellant,
*v.*
BLAKE JENSEN AND MICHAEL TOSCANO,
Appellees.

Opinion
No. 20231081-CA
Filed January 29, 2026

Third District Court, Salt Lake Department
The Honorable Adam T. Mow
No. 180900259

Ronald Ady, Attorney for Appellant

T. Jake Hinkins, Attorney for Appellees

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES RYAN D. TENNEY and AMY J. OLIVER concurred.

LUTHY, Judge:

¶1 A used car dealership owned by Blake Jensen and represented by his agent Michael Toscano bought a Toyota Tacoma at auction and then sold it to Richard Tidwell under the terms of a contract of sale. Tidwell later discovered extensive rust damage to the frame, and he sued Jensen and Toscano for fraud, negligent misrepresentation, and violations of the Utah Consumer Sales Practices Act (UCSPA).

¶2 At trial, after Tidwell finished presenting his case, Jensen and Toscano moved for judgment as a matter of law on all of Tidwell's claims. The district court granted the motion, concluding that (1) there was insufficient evidence to support Tidwell's fraud and negligent misrepresentation claims because Tidwell could not have reasonably relied on Jensen's and Toscano's representations or sustained compensable damages

given the terms of the contract of sale and (2) Tidwell's UCSPA claim failed because the UCSPA required him to prove that Jensen and Toscano knew or intended their representations about the Tacoma to be false and Tidwell failed to put on evidence of such knowledge or intent.

¶3 Tidwell appeals, contending as to his fraud and negligent misrepresentation claims that the evidence at trial was sufficient to support a finding that he reasonably relied on misrepresentations by Jensen and Toscano notwithstanding the terms of the contract of sale. He further asserts that his UCSPA claim did not require proof that Jensen and Toscano knew or intended their representations to be false, only that they knew or intended themselves to be making the representations. Tidwell's contentions are well taken. We therefore reverse the grant of judgment as a matter of law and remand this case for a new trial.

BACKGROUND[1]

*B. Jensen Auto Sales*

¶4 Jensen does business as B. Jensen Auto Sales, and Toscano is his agent. In May 2017, Toscano appeared virtually at the Manheim Auto Auction as a representative for B. Jensen Auto Sales. He was interested in the 2004 Toyota Tacoma truck at issue in this case.

*The National Auto Auction Association's Arbitration Policy*

¶5 Dealers and dealers' representatives who attend Manheim's auctions agree to have read the National Auto

---

1. Our review of a district court's grant of judgment as a matter of law requires us to "examin[e] all evidence in a light most favorable to the non-moving party," who in this case is Tidwell. *Montgomery v. Gardiner*, 2025 UT App 146, ¶ 30, 579 P.3d 1083 (cleaned up). We recite the facts accordingly.

Auction Association's Arbitration Policy (the Arbitration Policy) and to be bound by its terms. Any dispute between a buyer and seller at auction that arises from the purchase or sale of a vehicle through the auction must be resolved through an arbitration conducted according to the terms of the Arbitration Policy. Jensen acknowledged that he had "probably" read the Arbitration Policy, and Toscano recalled having read at least the portion of the Arbitration Policy that outlines buyers' responsibilities.

¶6 Under the Arbitration Policy, the seller at auction is required to disclose "permanent structural damage" and "any structural alterations" to the vehicle, including any "[a]ltered suspension that requires the structure to be modified from its [original] form" and "[c]orrosion of structural components determined by," among other things, "the affected area no longer possess[ing] its absorption or deflection properties." Nat'l Auto Auction Ass'n, *Arbitration Policy* § VIII(3) (effective Apr. 17, 2017), https://diminishedvalueofgeorgia.com/wp-content/uploads/NAAA_Arbitration_Policy_for_Auction_Transactions-2017.pdf[https://perma.cc/ZD9D-JAEZ]. "Prior to placing bids, the [b]uyer is responsible for inspecting" and for "reviewing all pertinent information" about vehicles on which they place bids, including "announcements, disclosures, condition reports," and "sale lights . . . , which identify various sale conditions." *Id.* § IV(1).

¶7 The Arbitration Policy explains that auctions will have "a standard light/video display system to describe the condition and/or disclosures related to the vehicle being sold." *Id.* § II. For instance, a yellow light "is an indication to the [b]uyer that [the] Auctioneer or Selling Representative has made announcements that qualify/clarify the condition or equipment and limit arbitration of [the] vehicle." *Id.* § II(2). "If a structural issue is properly disclosed, the vehicle may only be arbitrated for improper repair of the designated area, existing permanent damage or repairs to other areas of the vehicle not disclosed, or for failure to be within the [Used Vehicle Measurement Standard] that was verified by visual inspection." *Id.* § VIII(4)(a).

## B. Jensen Auto Sales Purchases the Tacoma

¶8    Prior to purchasing the Tacoma at the Manheim auction in May 2017, Toscano had access to and looked at the Manheim Electronic Condition Report (ECR) for the Tacoma, which contained the note "ALT SUSPENSION/STRUCTURAL." As the Tacoma went on the auction block, a yellow light was illuminated and an announcement was made and displayed indicating that the Tacoma had the condition "ALT SUSPENSION/STRUCTURAL."

¶9    Toscano purchased the Tacoma and was given a bill of sale, which also noted the condition of the Tacoma as "ALT SUSPENSION/STRUCTURAL." Jensen did not later seek to arbitrate the sale of the vehicle.

## B. Jensen Auto Sales Sells the Tacoma to Tidwell

¶10    B. Jensen Auto Sales posted an ad for the Tacoma online, and on June 23, 2017, Tidwell came to the dealership to inquire about the truck. Toscano showed Tidwell the Tacoma. Tidwell repeatedly asked Toscano about the frame, and Toscano told him "it was fine." Toscano told Tidwell that "they" (apparently meaning the auction) had sprayed a rubberized coating on the frame for "extra rust protection." Tidwell "tried looking at" the frame, but Toscano stopped him, pointing to a spot that was in good condition and had not been sprayed and saying, "That's what the rest of the frame looks like." Toscano also told Tidwell that the truck had "passed inspection." Tidwell did not take the truck for a test drive, but he expressed a desire to obtain an independent inspection. Toscano dissuaded him, saying, "You'll waste $50. It's been inspected already. So why?" Toscano told Tidwell that he needed to leave for another commitment, and Tidwell indicated that he would probably return the following morning to purchase the truck.

¶11    Tidwell returned the following morning. The dealership had, that morning, obtained a third-party safety inspection of the

Tacoma. Tidwell talked to Toscano about his plans to use the Tacoma to go hunting in the mountains, and Toscano replied that the truck would "do great," while Jensen—who was sitting nearby—said it would "climb walls." Tidwell again wanted to take the Tacoma for an inspection, but Toscano indicated that another person interested in the truck was on his way to the dealership and that the dealership would sell it to whomever was ready to purchase it first.

¶12     Tidwell began filling out paperwork with Toscano to purchase the Tacoma. Although not originally displayed in the Tacoma's window, a Buyer's Guide was produced by Toscano while Tidwell was signing papers, and Tidwell signed it. The Buyer's Guide stated, "IMPORTANT: Spoken promises are difficult to enforce. Ask the dealer to put all promises in writing." Also on the Buyer's Guide, a box was marked indicating that the sale was "AS IS—NO WARRANTY." Below this box was printed, "YOU WILL PAY ALL COSTS FOR ANY REPAIRS. The dealer assumes no responsibility for any repairs regardless of any oral statements about the vehicle."

¶13     Tidwell also signed a Motor Vehicle Contract of Sale (the Contract). The Contract contains the following notice: "The information you see on the window form [Buyer's Guide] for this vehicle is part of [the Contract]. Information on the window form overrides any contrary provisions in the [Contract]." (First brackets in original.) The back page of the Contract is labelled "Conditions and Warranties." One of the terms contained therein says,

> NO WARRANTIES, EXPRESS OR IMPLIED, ARE MADE OR WILL BE DEEMED TO HAVE BEEN MADE BY EITHER SELLER OR THE MANUFACTURER . . . EXCEPTING ONLY THE CURRENT PRINTED WARRANTY . . . , WHICH WARRANTY . . . SHALL BE EXPRESSLY IN LIEU OF ANY OTHER WARRANTY, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO

> ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE . . . .

¶14 Tidwell purchased the Tacoma for $11,000.

*Tidwell Discovers the Tacoma's Frame is Rusted Out*

¶15 Several weeks later, Tidwell drove the Tacoma on the freeway for the first time and noticed that "it was kind of wobbling" and "not going straight." So he took the truck to an auto repair shop and left it for the shop to "[f]igure out what was going on." A state-certified safety inspector from the shop (Inspector) later called Tidwell and told him the "frame [was] cancered out." Inspector reported that the frame was so rusted that it could break at any time and that the truck was "just not safe" for anyone to drive. Tidwell left the truck parked at the auto repair shop "for a couple of months" before retrieving it.

¶16 The same day Inspector called Tidwell, Tidwell called Toscano and told him the Tacoma's frame was "rusted out" and could not safely be driven. Through several subsequent phone conversations, Tidwell indicated that he wanted to return the truck and get his money back. Toscano told him "the money [was] long gone" and encouraged him to sell the truck to someone else. At that point, Tidwell retained counsel and filed the present lawsuit.

*The Complaint and Trial*

¶17 Tidwell alleged claims against Jensen and Toscano for fraud, negligent misrepresentation, and violations of the UCSPA.[2]

---

2. Tidwell initially alleged additional claims against Jensen, Toscano, and others as well, but he later stipulated to the dismissal of all these additional claims except three that he

(continued…)

¶18 The case proceeded to a three-day jury trial. Tidwell called Jensen, Toscano, Inspector, the manager of the auto shop where Inspector worked (Manager), and Tidwell's daughter as witnesses. Tidwell also testified, relating the facts set forth above regarding his interactions with Jensen and Toscano.

¶19 Jensen testified regarding the provisions of the Arbitration Policy that are set forth above. He also acknowledged that when purchasing a vehicle at a Manheim auction, it was his "responsibility" to review the announcements and disclosures regarding the vehicles he purchased. He initially testified that he interprets an "alt suspension/structural" announcement at auction to mean the vehicle's suspension has been altered and not that the vehicle has structural damage, explaining that he would expect structural damage to be announced as "structural damage." He also said that the Tacoma had been "lifted" and, thus, that it "fit . . . the announcement." Later, however, he testified, as follows, that an "alt suspension/structural" announcement can refer to "structural damage":

> Q.    So according to these arbitration policies, "alt suspension/structural" is not limited to lift kits, is it?
>
> A.    Altered suspension? No.
>
> Q.    It also includes structural damage to the vehicle, correct? . . .
>
> A.    From the altered suspension?

---

brought against the shop that inspected the Tacoma for B. Jensen Auto Sales on the morning Tidwell purchased the Tacoma. The court ultimately dismissed those three claims, and Tidwell does not challenge that ruling. Accordingly, we do not discuss the additional claims further.

Q.   So when you—

A.   Yes. Yes.

Q.   Yes. So when you testified . . . that "alt suspension/structural" referred to a lift kit— that's what you understood it to mean— that's not correct is it?

A.   It is correct.

Q.   But "alt suspension/structural" also refers to structural damage, correct?

A.   It can.

¶20   Jensen further testified that the Tacoma had undergone a post-sale inspection by Manheim and passed. But he acknowledged that Manheim's post-sale inspection policy stated that "items disclosed by the seller will not be inspected and/or guaranteed under" the post-sale inspection.

¶21   During Jensen's testimony, an issue arose concerning the admissibility of a Toyota "Case Activity Report." The report apparently showed that Toyota headquarters received two calls on June 14, 2017—after B. Jensen Auto Sales bought the Tacoma at auction and nine days before Tidwell came to B. Jensen Auto Sales—about the Tacoma. The notes for the first call indicate that the caller claimed to be the Tacoma's owner, said the frame was "cracking every[where] and he had the spray done," and was seeking repair of the rusted frame. The notes for the second call indicate that it came from someone "looking to purchase this vehicle" who "want[ed] to know if [the] frame could be replaced by [T]oyota."

¶22   When Tidwell's counsel attempted to question Jensen about the report, Jensen's counsel objected, arguing that the document was hearsay and that a proper foundation for the

document had not been laid. Tidwell's counsel responded that the document was not hearsay because it was a regularly kept business record, as indicated by an affidavit from a Toyota representative, and that Jensen could read the document to the jury because he was the owner and in sole possession of the truck at the time of the calls. The court ruled that because Jensen had never seen the document and did not provide it, there was insufficient foundation "for him to testify from the document." Tidwell's counsel indicated that he would still like to have the document admitted, even if Jensen could not read from it. The court—after noting that the "business records affidavit" Tidwell's counsel said Toyota had provided to authenticate the document was not "in front of" the court—responded, "No. . . . There isn't sufficient foundation laid for this."

¶23  Toscano then testified. He said that his understanding of the "alt suspension/structural" announcement was that it indicated only an altered suspension, not frame damage, and that an announcement for frame damage would say "frame damage." He also stated that the grade Manheim reported for the Tacoma— 3.4—would have been 1.9 or lower if it had frame damage. He said there was no reason to arbitrate the Tacoma because the truck arrived at the dealership looking "beautiful" and having "no troubles."

¶24  Toscano further testified that the Buyer's Guide was displayed in the Tacoma's window when Toscano showed Tidwell the Tacoma. Toscano denied that Tidwell told Toscano he planned to use the truck to go hunting. Toscano also denied saying "the Tacoma would go up the back roads used for hunting, no problem." Toscano said he did not discourage Tidwell from visually inspecting the Tacoma's frame or assure him that the frame was in good condition. He insisted that although he did have to leave the dealership for another commitment while Tidwell was there the first time, he did not tell Tidwell he could not take the Tacoma for a test drive. Rather, Toscano said that Tidwell asked to take the truck overnight, that taking the truck overnight was not permitted, and that Tidwell could have taken

the truck the following day for an independent inspection. Toscano also denied warning Tidwell, in light of Tidwell's desire to take the Tacoma for an inspection, that another potential buyer was coming for the Tacoma.

¶25 Toscano testified that Tidwell noticed the rubberized undercoating—a coating Toscano said some people put on lifted trucks to make the exposed frame "look better"—but that Toscano did not see a spot where the undercoating was missing. Toscano also agreed that he had "assured Mr. Tidwell, prior to his signing the papers, that the vehicle passed [a] safety emissions inspection," although he denied telling Tidwell on the evening before the sale that this had already taken place and claimed, instead, to have said as much on the morning Tidwell returned to purchase the Tacoma, after the safety inspection had been completed. He further confirmed that Jensen told Tidwell "something like," "Yeah, the truck will get you out of anything. That [truck] will climb a wall if it has to."

¶26 Inspector testified regarding photos taken of the Tacoma while it was in the repair shop, which were submitted to the jury as exhibits and showed obvious and significant rust damage. He stated that when he inspected the Tacoma, the frame was cracked and the vehicle "looked like it was about ready to break apart." He explained that although he did not inspect the Tacoma until several weeks after Tidwell purchased it, he had never "seen a vehicle where rust damage ha[d] occurred in the course of six weeks." Inspector opined that the Tacoma "was unsafe to drive." And he acknowledged that someone would have to climb underneath the Tacoma to see the damage.

¶27 Manager testified that the Tacoma's frame was cracked and "severely rusted" and that he informed Tidwell the vehicle was unsafe and should never have "been able to be safety inspected and passed." He also testified that he did not know who applied the rubberized undercoating but that "[i]t looked like it was used to cover up the rust and the cracks in the frame." Manager acknowledged on cross-examination that the Tacoma's CARFAX

Vehicle History Report indicated that the vehicle passed inspections both before and after it was brought to his shop and that various entries in the CARFAX report did not catalog any frame damage.

¶28　Tidwell's daughter testified that she had called Toscano about the truck and he told her that "he was not able to help," "his hands were tied," and "returning the truck and getting money back" was not an option.

*Judgment as a Matter of Law*

¶29　At the close of Tidwell's evidence, Jensen and Toscano moved for judgment as a matter of law under rule 50 of the Utah Rules of Civil Procedure. The court granted the motion orally the next day. In doing so, it highlighted that the Contract stated that no warranties applied and that the Contract incorporated the Buyer's Guide, which indicated that the Tacoma was being sold "as is, no warranty" and that the purchaser would "pay for all costs for any repairs." The court then reasoned,

> [W]hile the tort claims are outside of the [C]ontract . . . , the [C]ontract is still relevant to establish the context in which statements were made about the subject vehicle.
>
> And while no party has raised or argued the applicability of the economic loss rule, . . . [and] my ruling is not dependent on the economic loss rule[,] . . . the policy of the economic loss rule is still instructive.
>
> That is, contract terms define and govern the subject of the transaction, as they are the best expression of the parties' agreement. They're relevant to analyzing the tort claims in this case, since those tort claims arise from the subject of the contractual transaction.

I find that a reasonable jury would not have a legally sufficient evidentiary basis to find for Mr. Tidwell on his claims for fraud or negligent misrepresentation against Mr. Jensen or Mr. Toscano for two reasons.

First, Mr. Tidwell could not have reasonably relied on statements Mr. Toscano, or anyone with B. Jensen Auto Sales, made in conjunction with the sale[] [b]ecause Mr. Tidwell acknowledged, in entering into the [C]ontract, that he was not relying on oral statements made during the sale, and that no warranties were given.

Second, both causes of action have the required element that Mr. Tidwell suffered damage as a result of relying on statements or representations made to him about the vehicle. But Mr. Tidwell's damages, to the extent they relate to repairs of the vehicle, were expressly waived by him in the [C]ontract provisions.

¶30 The court then addressed Tidwell's UCSPA claim in relevant part as follows:

The [UCSPA] requires that a supplier act knowingly or intentionally . . . . So for . . . example, there must be evidence that defendants knowingly or intentionally indicated that the subject of a consumer transaction . . . [had certain] performance characteristics, accessories, uses, or benefits, [when] it [did] not.

Said differently, Mr. Tidwell must have presented evidence that the defendants indicated that the subject vehicle had a particular . . .

mechanical condition or use, and knew it did not have such condition or use.

The requisite mental state applies to both making the indication—that is the statement—and the statement's falsity. A mistake of fact or ignorance of fact, in my reading of the statute, is not enough to be a violation of the [UCSPA].

Mr. Tidwell has not presented evidence that any of the defendants actually knew that the subject vehicle had frame damage, or was unsuitable for Mr. Tidwell's use. Instead, he has argued that they should have known, or made reasonable investigation before making the statements. But that's not enough under the [UCSPA].

*The Posttrial Proceedings*

¶31    The court memorialized its foregoing ruling and reasoning in an Order Granting Defendants' Motion for Judgment as a Matter of Law, which dismissed Tidwell's claims against Jensen and Toscano with prejudice. Tidwell then filed a timely motion for a new trial under rule 59 of the Utah Rules of Civil Procedure, which the court orally denied at a hearing on the motion. Tidwell then filed a notice of appeal, after which the district court entered its written order denying Tidwell's motion for a new trial.[3]

---

3. Because Tidwell filed no new or amended notice of appeal after the district court entered its written order denying his rule 59 motion, we are precluded from considering issues arising solely from the rule 59 motion. *See* Utah R. App. P. 4(b)(2) (stating that a "notice of appeal filed after announcement or entry of judgment, but before entry of an order disposing of" a rule 59 motion for a new trial is "effective to appeal only the underlying judgment").

(continued…)

ISSUE AND STANDARD OF REVIEW

¶32   On appeal, Tidwell argues that the district court erred in granting Jensen and Toscano's motion for judgment as a matter of law. "This court's standard of review of a judgment as a matter of law is the same as that imposed upon a trial court. A trial court is justified in granting a judgment as a matter of law only if, examining all evidence in a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor." *Sheppard v. Geneva Rock*, 2021 UT 31, ¶ 24, 493 P.3d 632 (cleaned up).[4]

ANALYSIS

I. Judgment As a Matter of Law

¶33   Tidwell asserts that the district court erred in granting Jensen and Toscano's motion for judgment as a matter of law. First, he argues that his tort claims were improperly dismissed because (1) notwithstanding the language in the Contract disclaiming warranties "regardless of any oral statements about

---

As a practical matter, however, this does not affect the scope of our analysis because the arguments Tidwell made in his rule 59 motion were also addressed in the court's order granting Jensen and Toscano's motion for judgment as a matter of law, from which Tidwell properly appeals.

4. Tidwell also argues that the district court abused its discretion by excluding the Toyota Case Activity Report. Because we reverse based on the evidentiary record before us, we need not rule on the admissibility of the Case Activity Report. We note only that the court's inadmissibility ruling appears to have been based ultimately on the lack of an adequate foundation. On remand, Tidwell may again seek admission of the report. If he does, the court should evaluate—along with any other relevant considerations—the foundation laid at that time.

the vehicle," he produced evidence at trial sufficient to support a finding that he reasonably relied on misrepresentations by Jensen and Toscano about the Tacoma and (2) he did not disclaim tort damages by entering into the Contract. Second, Tidwell contends that his UCSPA claim was improperly dismissed because that statute does not require an intent to deceive. Tidwell's arguments are well taken, and we address each of them in turn.

A.    Tidwell's Tort Claims

1.    The Contract did not as a matter of law preclude Tidwell's reasonable reliance on Jensen's and Toscano's representations

¶34    Tidwell contends that the district court erred by concluding as a matter of law that because of statements made in the Contract, he could not have reasonably relied on Jensen's and Toscano's representations.[5] We agree.

---

5. Tidwell frames his argument by saying that the Contract does "not state a disclaimer of liability in tort" and that the Contract "cannot operate as a waiver of [Jensen's and Toscano's] liability in tort." But the district court did not conclude that the Contract constituted an outright disclaimer or waiver of Tidwell's tort claims; rather, it acknowledged that "the tort claims are outside of the [C]ontract." The court reasoned, however, that the terms of the Contract are "relevant to analyzing the tort claims" and that in light of certain terms in the Contract, "a reasonable jury would not have a legally sufficient evidentiary basis to find" that Tidwell "reasonably relied on statements" made by Jensen and Toscano outside the Contract. Although Tidwell's argument as articulated may misapprehend the district court's analysis, because his argument is a challenge to the court's ruling, we construe it (particularly in light of its reliance on *Robinson v. Tripco Investment, Inc.*, 2000 UT App 200, 21 P.3d 219—*see infra* ¶¶ 36–42) to be that the court erred by concluding as a matter of law that

(continued…)

¶35 In ruling on Jensen and Toscano's motion for judgment as a matter of law, the district court highlighted the language in the Contract stating that no warranties applied and the language of the Buyer's Guide indicating that the Tacoma was being sold "as is, no warranty." The court then reasoned that those contractual statements were "the best expression of the parties' agreement" and, thus, that "a reasonable jury would not have a legally sufficient evidentiary basis to find" that Tidwell "reasonably relied on statements [Toscano], or anyone with B. Jensen Auto Sales, made in conjunction with the sale" outside the Contract.[6]

¶36 In support of a contrary conclusion, Tidwell points to *Robinson v. Tripco Investment, Inc.*, 2000 UT App 200, 21 P.3d 219. In that case, a buyer purchased an apartment building from a seller. *See id.* ¶ 4. When the buyer's manager inspected the building with the seller before purchasing it, "he observed a sloping of the concrete floor, cracks in the plaster, gaps between

---

because of statements made in the Contract, Tidwell could not have reasonably relied on Jensen's and Toscano's representations.

6. In articulating its reasoning, the district court said that it found "the policy of the economic loss rule [to be] instructive." But it also said that its "ruling [was] not dependent on the economic loss rule." Because the district court did not decide whether the economic loss rule precludes Tidwell's fraud and negligent misrepresentation claims, we do not reach that potential question. *See generally Richmond v. Bateman*, 2024 UT App 103, ¶ 31, 554 P.3d 341 ("We are mindful that we are a court of review, not of first view." (cleaned up)). On remand, the parties remain free to argue the applicability of the economic loss rule. In that regard, we note only that our supreme court has "conclude[d] that the economic loss rule applies where a party's tort claims are entirely duplicative of its contract claims," but that it has "not foreclose[d] the possibility of a fraudulent inducement exception [to the economic loss rule] in some other circumstance." *See HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 2018 UT 61, ¶¶ 22–23, 435 P.3d 193.

the walls and the ceiling, and some ill-fitting doors." *Id.* ¶ 5. However, the seller "represented that the building was strong and free of any structural problems," and he "indicated that he was involved in the engineering and construction of the building . . . and that it was over-engineered and over-built." *Id.* He also told the buyer "that the building would withstand earthquakes that many other buildings would not." *Id.* Additionally, "[a]fter making these representations, [the seller] provided [the buyer] with an inspection report he had previously obtained, and which did not identify any problems with the support system." *Id.*

¶37 The parties then signed a sales agreement that stated, among other things, that the buyer agreed that it was "purchasing [the] property upon [the buyer's] own examination and judgment and not by reason of any representation made to [the buyer] by [the seller] . . . as to its condition"; that the buyer accepted "the property in 'as is' condition"; that the agreement constituted "the entire agreement between the parties and supercede[d] and cancel[ed] any and all prior negotiations, representations, warranties, understandings or agreements between the parties"; and that there were "no oral agreements which modif[ied] or affect[ed] [the] agreement." *Id.* ¶ 4.

¶38 After purchasing the building and subsequently facing either expensive repairs or condemnation of the property by the city, the buyer brought suit against the seller, claiming, among other things, fraud with respect to major structural defects. *See id.* ¶ 7. The district court granted summary judgment in the seller's favor. *See id.* ¶ 8. On appeal, the buyer argued that the court had erroneously dismissed its fraud claim by concluding, among other things, that the buyer could not have reasonably relied on the seller's representations in light of the language of their agreement. *See id.* ¶ 15. This court agreed with the buyer. *See id.* ¶¶ 19–22.

¶39 We first explained the relevant element of the buyer's fraud claim, stating:

One of the elements of fraud that a plaintiff must prove is that he or she, acting reasonably and in ignorance of the statement's falsity, did in fact rely upon the misrepresentation. Thus, not only must there be reliance, but the reliance must be justifiable under the circumstances. While the question of whether a plaintiff was reasonable in his or her reliance is usually a matter within the province of the jury, there are instances where courts may conclude that as a matter of law, there was no reasonable reliance.

To determine whether the reliance was reasonable, the reliance must be considered with reference to the facts of each case. In general, a plaintiff may justifiably rely on positive assertions of fact without independent investigation. It is only where, under the circumstances, the facts should make it apparent to one of his [or her] knowledge and intelligence, or he [or she] has discovered something which should serve as a warning that he [or she] is being deceived, that a plaintiff is required to make his [or her] own investigation.

*Id.* ¶¶ 19–20 (cleaned up).

¶40    We then considered whether there was a genuine issue of material fact as to whether the buyer had reasonably relied on the seller's representations, reasoning as follows:

Applying the foregoing legal principles to the facts of this case, we cannot say as a matter of law that [the buyer] was unreasonable in its reliance on [the seller's] statements regarding the structural integrity of the building. Viewing the facts in the light most favorable to [the buyer], they demonstrate that [the buyer's manager] walked

through the building with [the seller] before [the buyer] purchased it. [The buyer's manager] questioned [the seller] regarding some problems he observed and [the seller] responded that he had been involved in the construction and engineering of the building, and that the building had no structural defects. To support that claim, [the seller] then provided [the buyer's manager] with an inspection report that failed to note any structural problems with the building. Simply stated, because [the seller] held himself out as someone with superior knowledge of the building and then lent support to his representations by providing an inspection report, a genuine issue of material fact exists as to whether [the buyer's] reliance was reasonable.

*Id.* ¶ 21. Accordingly, we held that the district court's grant of summary judgment was improper. *See id.* ¶ 22.

¶41　While *Robinson* was decided on summary judgment prior to trial rather than on a motion during trial for judgment as a matter of law, it is informative as to whether the question of Tidwell's reasonable reliance was properly resolved as a matter of law. As we noted in *Robinson*, "the question of whether a plaintiff was reasonable in his or her reliance is usually a matter within the province of the jury." *Id.* ¶ 19 (cleaned up). And we determined in *Robinson* that the buyer's claim of reasonable reliance was viable even though the sales agreement stated that the buyer was "purchasing [the] property . . . not by reason of any representation made to [the buyer] by [the seller]," that the written agreement "constitute[d] the entire agreement between the parties and supercede[d] and cancel[ed] any and all prior . . . representations," and that there were "no oral agreements which modif[ied] or affect[ed] [the written] agreement." *Id.* ¶ 4. In other words, the language of the contract in *Robinson* was at least as exhaustive in disclaiming reliance on oral representations as the

language of the Contract here, yet we still determined that the issue of whether the buyer nevertheless reasonably relied on the representations the seller made outside the contract should survive summary judgment. In so determining, we emphasized the seller's claim to superior knowledge regarding the building and his production of an inspection report to support his representations.

¶42 Based on that determination, a similar outcome is required here. Tidwell testified that he talked to Toscano about his plans to take the Tacoma into the mountains to go hunting. At that point, Toscano—implying that he had superior knowledge about the Tacoma—indicated that the truck would "do great," while Jensen—who was sitting nearby—likewise said it would "climb walls." Tidwell also testified that Toscano pointed to a visible, un-rusted spot on the frame and said, "That's what the rest of the frame looks like." Also like the seller in *Robinson*, Toscano supported his own assessment of the Tacoma by assuring Tidwell that the truck had passed a safety inspection, and Tidwell testified that Toscano even dissuaded him from obtaining an independent inspection. This evidence provided a basis for the jury to find that Tidwell reasonably relied—for tort purposes—on Jensen's and Toscano's representations notwithstanding his contractual disclaimer of warranties and his contractual acknowledgment that he was purchasing the truck as-is. Accordingly, the district court erred by concluding otherwise.

2.     Tidwell did not disclaim tort damages by entering the Contract

¶43 Tidwell also contends that the district court erred by concluding as a matter of law that he disclaimed tort damages by entering the Contract. Again, we agree.

¶44 In ruling on Jensen and Toscano's motion for judgment as a matter of law, the district court noted that both of Tidwell's tort claims require Tidwell to have suffered damage as a result of relying on the representations made to him about the Tacoma. It

then reasoned that any "damages, to the extent they relate to repairs of the vehicle, were expressly waived by him in the [C]ontract provisions." In so reasoning, the court appears to have been referring to this statement in the Contract: "The dealer assumes no responsibility for any repairs regardless of any oral statements about the vehicle."

¶45   For parties to successfully disclaim tort claims generally via a contract, the language of the contract must clearly and unequivocally state that disclaimer. *See Interwest Constr. v. Palmer*, 923 P.2d 1350, 1356 (Utah 1996) ("While parties to a contract may generally exempt themselves from negligence liability, the language they use must clearly and unequivocally express an intent to limit tort liability in the contract itself." (cleaned up)). "Without such an expression of intent, the presumption is against any such intention, and it is not achieved by inference or implication from general language." *Id.* (cleaned up). Logically, the same requirement must apply to a disclaimer of tort damages because a disclaimer of tort damages is effectively a disclaimer of any meaningful ability to pursue the tort claim generally.

¶46   Here, there is nothing in the Contract or the incorporated Buyer's Guide that clearly and unequivocally expressed an intent to limit tort liability generally or tort damages specifically. Therefore, Tidwell did not bargain away his ability to seek tort damages under the language of the Contract and Buyer's Guide, and to the extent the court determined that he did, it erred.

3.      Tidwell produced evidence in support of the other elements of fraud and negligent misrepresentation

¶47   To preclude judgment as a matter of law, Tidwell was required to put on evidence of the elements of fraud and negligent misrepresentation in addition to evidence of his reasonable reliance on Jensen's and Toscano's representations. We therefore consider whether there was an evidentiary basis for the jury to find the other elements of fraud and negligent misrepresentation. *See generally Olguin v. Anderton*, 2019 UT 73, ¶ 20, 456 P.3d 760 ("It

is within our discretion to affirm a judgment on an alternative ground if it is apparent in the record." (cleaned up)).

¶48 Fraud requires proof of the following elements:

> (1) a representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he or she had insufficient knowledge on which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his or her injury and damage.

*Robinson v. Tripco Inv., Inc.*, 2000 UT App 200, ¶ 12, 21 P.3d 219 (cleaned up).

¶49 Examining the evidence in a light most favorable to Tidwell, as we must, *see Montgomery v. Gardiner*, 2025 UT App 146, ¶ 30, 579 P.3d 1083, we determine that he presented evidence from which a jury could find that each of these elements was satisfied. We have already determined that there was evidence that Tidwell reasonably relied on Jensen's and Toscano's representations regarding the Tacoma, the sixth element identified above. Additionally, there was evidence sufficient to support the first, second, third, fifth, seventh, eighth, and ninth elements of fraud: (1) Tidwell testified that Toscano and Jensen made representations that the Tacoma's frame was in good condition and suitable for driving on mountain roads; (2) according to Tidwell, these statements applied to the status of the frame at the time the Tacoma was sold to him; (3) Inspector and Manager testified that the Tacoma's frame was rusted out, making Jensen's and Toscano's representations false; (5) a reasonable inference may be drawn that Jensen's and Toscano's statements were intended to induce Tidwell to purchase the Tacoma by allaying his concerns about the frame and assuring him the

Tacoma would suit his needs; (7) Tidwell testified that he relied on these statements when deciding to purchase the Tacoma; (8) it is undisputed that Tidwell actually purchased the Tacoma; and (9) if the foregoing evidence is believed, then Tidwell was damaged when he spent $11,000 on a vehicle that was unsafe to drive.

¶50 We further determine that there was also evidence of the fourth element identified above, namely, that Jensen and Toscano were at least reckless as to whether their representations about the Tacoma were true. Jensen testified that dealers and dealers' agents who attend Manheim auctions agree to have read the Arbitration Policy, and the jury heard evidence that Jensen had actually read the Arbitration Policy. Toscano testified that he recalled having read at least the portion of the Arbitration Policy that outlines buyers' responsibilities. Under the Arbitration Policy, buyers are responsible for "reviewing all pertinent information" about vehicles on which they place bids, including "announcements, disclosures, condition reports," and "sale lights . . . , which identify various sale conditions." Nat'l Auto Auction Ass'n, *Arbitration Policy* § IV(1) (effective Apr. 17, 2017). And here, Toscano acknowledges having reviewed a condition report prior to bidding on the Tacoma, having seen the yellow light as the Tacoma went across the auction block, and otherwise having known of the "alt suspension/structural" disclosure. Jensen testified that an "alt suspension/structural" disclosure can refer to structural damage in at least some circumstances. And after Jensen and Toscano learned that the Tacoma had significant rust damage, they did not pursue arbitration through Manheim, suggesting that they knew the rust damage had been properly disclosed. This evidence suggests that Jensen and Toscano acted recklessly with regard to the truth of their representations about the Tacoma.

¶51 Additionally, Tidwell testified that Toscano dissuaded him from looking at the Tacoma's frame, including by pointing to a spot on the frame that was in good condition and saying, "That's what the rest of the frame looks like." Tidwell also testified that

Toscano twice dissuaded him from getting an independent inspection of the truck—once by telling him it would be a waste of money and once by saying another potential buyer was on his way to the dealership. This testimony, if believed, supports an inference that the dealership knew of the rust damage because it had looked under the truck and, thus, must have seen the obvious problems. It also supports an inference that Toscano personally knew of the rust damage and was trying to prevent Tidwell from discovering it by looking under the truck himself or taking it for an independent inspection.

¶52    In sum, while it is not certain whether Tidwell would have prevailed on either tort claim at trial, we cannot say "there [was] no competent evidence that would [have] support[ed] a verdict in [his] favor." *Sheppard v. Geneva Rock*, 2021 UT 31, ¶ 24, 493 P.3d 632 (cleaned up).

¶53    "A claim for negligent misrepresentation requires a party to demonstrate that (1) a party carelessly or negligently makes a false representation expecting the other party to rely and act thereon, (2) the [other party] actually relies on the statement, and (3) [the other party] suffers a loss as a result of that reliance." *Moore v. Smith*, 2007 UT App 101, ¶ 36 n.12, 158 P.3d 562 (cleaned up). For the same reasons identified above, Tidwell presented evidence upon which the jury could rely in finding that these elements were satisfied.

¶54    Because Tidwell provided evidence from which a jury could have found in his favor, the district court erred in granting judgment as a matter of law to Jensen and Toscano on Tidwell's tort claims.

B.    Tidwell's UCSPA Claims

¶55    We next consider whether the district court properly dismissed Tidwell's UCSPA claims. We conclude that it did not.

¶56 The UCSPA is set forth in Chapter 11 of Title 13 of the Utah Code.[7] The version in effect at the time of the events giving rise to this case stated that "a supplier commits a deceptive act or practice if," among other things, "the supplier knowingly or intentionally . . . indicates that the subject of a consumer transaction has . . . performance characteristics, . . . uses, or benefits, if it has not." Utah Code § 13-11-4(2) (2017).[8]

¶57 The district court interpreted this provision as saying both that the supplier must knowingly or intentionally indicate that the item has certain performance characteristics, uses, or benefits *and* that the supplier must know or intend that the item does not have those characteristics, uses, or benefits, saying:

> Tidwell must have presented evidence that the defendants indicated that the subject vehicle had a particular . . . mechanical condition or use, and knew it did not have such condition or use. The requisite mental state applies to both making the indication—that is the statement—and the statement's falsity. A mistake of fact or ignorance of fact, in my reading of the statute, is not enough to be a violation of the [UCSPA].

The court erred in its interpretation.

¶58 "The first step of statutory interpretation is to look to the plain language, and where statutory language is plain and unambiguous, [we] will not look beyond the same to divine

---

7. The version of the UCSPA in effect at the time of the events giving rise to this case allowed "[a] consumer who suffer[ed] loss as a result of a violation of [the UCSPA to] recover, but not in a class action, actual damages or $2,000, whichever is greater, plus court costs." Utah Code § 13-11-19(2) (2017).

8. This subsection has since been amended to remove "knowingly or intentionally." *See* Utah Code § 13-11-4(2).

legislative intent. Rather, we are guided by the rule that a statute should generally be construed according to its plain language." *Bryner v. Cardon Outreach, LLC*, 2018 UT 52, ¶ 9, 428 P.3d 1096 (cleaned up).

¶59 The plain language of this provision does not require the supplier to have knowledge or intent as to whether the subject of the transaction actually has the attribute the supplier indicated. *See* Utah Code § 13-11-4(2)(a) (2017). Instead, the supplier must simply make the indication knowingly or intentionally, and if the item does not possess the attribute, the supplier has committed a "deceptive act" as that term is used in the statute. *See id.* This is evidenced by the fact that the conditional clause "if it has not" has a different subject—namely, "it," meaning the item itself—from the clause that precedes it, whose subject is a supplier who knowingly or intentionally indicates something. Because the supplier's knowledge or intent is, thus, grammatically disconnected from the actual condition of the item, a person bringing a claim under this provision need not prove that the supplier knew or intended the item to not have the characteristics, uses, or benefits indicated.

¶60 In sum, the district court erred by interpreting the UCSPA as requiring Tidwell to prove that Toscano and Jensen intended or knew their representations to be false. And because Tidwell provided evidence that (1) Toscano and Jensen knowingly or intentionally indicated the Tacoma had certain performance characteristics, uses, or benefits and (2) the Tacoma did not have those performance characteristics, uses, or benefits, the court erred in dismissing Tidwell's UCSPA claims. We therefore reverse the dismissal of those claims.

## II. Attorney Fees

¶61 Tidwell also requests his attorney fees on appeal. We deny this request.

¶62   "In Utah, attorney fees are awardable only if authorized by statute or contract." *Cheney v. Hinton Burdick Hall & Spilker, PLLC*, 2015 UT App 242, ¶ 19, 366 P.3d 1220 (cleaned up). Tidwell points to the Contract as the basis for his fee request, noting that the Contract "provides for recovery of attorney fees if it becomes necessary for the seller to enforce its terms" and arguing that "[u]nder the reciprocal fees statute, Utah Code Ann. [section] 78B-5-826, [he is] entitled to an award of attorney fees if [he] prevail[s] on the current appeal."

¶63   However, the entire thrust of Tidwell's argument in combatting the district court's dismissal of his tort claims is that his tort claims are distinct from and not based on the Contract. Therefore, it is inappropriate to award him attorney fees based on a provision of the Contract related to enforcing the terms of the Contract.

## CONCLUSION

¶64   The district court erred in dismissing Tidwell's claims against Jensen and Toscano as a matter of law. We remand this matter for a new trial.

———————